# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2019

Lyle W. Cayce
Clerk

_____

No. 17-10943

_____

THE INCLUSIVE COMMUNITIES PROJECT, INCORPORATED,

      Plaintiff - Appellant

v.

LINCOLN PROPERTY COMPANY; LEGACY MULTIFAMILY NORTH III, L.L.C.; CPF PC RIVERWALK, L.L.C.; HLI WHITE ROCK, L.L.C.; BRICK ROW APARTMENTS, L.L.C.,

      Defendants - Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

ON PETITION FOR REHEARING EN BANC
(Opinion  04/09/2019, 5 Cir.,  920 F.3d 890)

Before DAVIS, JONES, and ENGELHARDT, Circuit Judges.

PER CURIAM:

(  )   Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. No member of the panel nor judge in regular active service of the court having requested that the court be polled on Rehearing En Banc (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

(✓)   Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED.  The court

having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED. In the poll, 7 judges voted in favor of rehearing (Chief Judge Stewart and Judges Dennis, Southwick, Haynes, Graves, Higginson, and Costa) and 9 judges voted against rehearing (Judges Jones, Smith, Owen, Elrod, Willett, Ho, Duncan, Engelhardt, and Oldham).

ENTERED FOR THE COURT:

KURT D. ENGELHARDT
UNITED STATES CIRCUIT JUDGE

No. 17-10943

HAYNES, Circuit Judge, joined by STEWART, Chief Judge, and DAVIS, DENNIS, SOUTHWICK, GRAVES, and HIGGINSON, Circuit Judges, dissenting from the denial of rehearing en banc:

Our court previously determined that the Fair Housing Act ("FHA") allows for disparate impact claims.[1] *Inclusive Cmtys. Proj., Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275 (5th Cir. 2014) (*Texas v. ICP I*). The Supreme Court affirmed. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Proj., Inc.*, 135 S. Ct. 2507, 2515–16 (2015) (*Texas v. ICP II*). Yet the panel majority opinion now renders that decision almost meaningless by crafting an impossible pleading standard. *Inclusive Cmtys. Proj. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019) (*Lincoln*). This case involves an important statute in a large city within a circuit full of large cities that contain numerous locations housing large, minority populations. The case is thus worthy of rehearing en banc. Unfortunately, a majority of our court disagrees, so en banc rehearing of this important, incorrectly-decided case has been denied. From that denial, I respectfully dissent.

It is unnecessary to repeat the excellent dissenting opinion. *Lincoln*, 920 F.3d at 912–25. I write to highlight a few points. The majority opinion incorrectly affirmed the district court's Rule 12(b)(6) dismissal of Plaintiff's disparate impact claim under the FHA. I have two main concerns with the majority opinion. First, it expands and overstates the Supreme Court's requirement of "robust causation," as set forth in its decision in *Texas v. ICP*

---

[1] There are two kinds of disparate impact claims: those "alleging a disparate impact on minorities with respect to the availability of housing" and "claims alleging perpetuation of segregation." *Inclusive Cmtys. Proj. v. Lincoln Prop. Co.*, 920 F.3d 890, 917 (5th Cir. 2019) (Davis, J., dissenting). I conclude that ICP has properly pleaded both.

*II.* Second, it makes a plaintiff's burden nearly insurmountable at the initial pleading stage in litigation by requiring immutable proof rather than plausible allegations. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

The FHA prohibits refusing "to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . ." 42 U.S.C. § 3604(a). The federal Housing Choice Voucher program, known as Section 8, pays rental subsidies to assist "low-income families in obtaining a decent place to live" in order to promote "economically mixed housing." 42 U.S.C. § 1437f(a). Landlord participation in the voucher program is voluntary under both federal and Texas state law. *Id.*; *see also* 24 C.F.R. § 982.301(b)(11). The majority opinion provides a detailed description of the allegations set forth in Plaintiff's complaint. *See Lincoln,* 920 F.3d at 895–99. Briefly, ICP describes itself as a "fair housing focused nonprofit organization working with households seeking access to housing in predominately non-minority locations in the Dallas area." ICP's mission includes "counseling, financial assistance, and other services to Black or African American households participating in the Section 8 Housing Choice Voucher Program administered by the Dallas Housing Authority (DHA)." ICP's housing mobility assistance to its DHA voucher clients is part of the relief recommended by this court to remedy the intentional segregation of public housing by the federal government, the City of Dallas, and the DHA, as described in *Walker v. City of Mesquite,* 169 F.3d 973, 984–88 (5th Cir. 1999). ICP pleaded that it had been "providing housing mobility services to its DHA voucher clients since 2005."

ICP provides guarantor services to facilitate the voucher program. But, contrary to the goals of the FHA, landlords in predominantly white areas often refuse vouchers. Specifically here, ICP identifies various high-opportunity

apartment complexes managed by Defendant Lincoln Property Company[2] in the Dallas metropolitan area and alleges Lincoln has a policy that it will not negotiate with, rent to, or otherwise make units available in predominantly white, non-Hispanic areas to voucher households.[3] Lincoln's policy applies to apartment complexes located in majority white census tracts that have units available at rents payable under the voucher program. ICP notes that it attempted to negotiate with Lincoln on behalf of voucher clients to no avail. ICP asserts that Lincoln's policy, which Lincoln advertises, causes voucher households in the Dallas area to live in racially concentrated and predominantly minority areas of high poverty that are marked by substantially unequal conditions. ICP thus alleged that this policy disparately impacts African-American households in the Dallas area and perpetuates segregation—ICP asserts the group affected by Lincoln's policy is over 80% African-American and 10% or less white, while the non-voucher population, the group unaffected by Defendants' policy, is allegedly 19% African-American and 53% white.

ICP alleged that its ability to assist its voucher clients in obtaining housing in high-opportunity areas is "obstructed by Defendants' discriminatory housing practices." ICP argued that this "no vouchers" policy violates the disparate impact standard of liability under the FHA, 42 U.S.C. § 3604(a), in two ways: (1) by causing the perpetuation of segregation (segregative-effect claim) and (2) by causing disproportionate harm to African-American households (traditional disparate impact claim).

---

[2] ICP names several other defendants who own apartment complexes managed by Lincoln. Because Lincoln manages all the other defendants' complexes, and the "no voucher" policy is theirs, the only defendant we refer to is Lincoln.

[3] Specifically, ICP alleges that the defendants have a general policy, which they advertise, "of refusing to negotiate with or rent to voucher households."

With this factual summary in mind, we turn to the law. Both the majority and dissenting opinions agree that the key case to be applied here is *Texas v. ICP II*, where the Supreme Court interpreted § 3604 of the FHA to include disparate impact claims. It defined such claims as asserting an unjustified and disproportionately adverse effect on minorities in the context of claims against a Texas governmental entity. *Texas v. ICP II*, 135 S. Ct. at 2513 ("The underlying dispute in this case concerns where housing for low-income persons should be constructed in Dallas, Texas—that is, whether the housing should be built in the inner city or in the suburbs."). It is worth emphasizing that the only issue before the Supreme Court in *Texas v. ICP II* was "whether disparate impact claims are cognizable under the Fair Housing Act . . ." *Id.* Notably, the procedural posture was quite different from the current case: the district court had granted the *plaintiff* a partial summary judgment and the remainder of the case had been tried. *Texas v. ICP I*, 747 F.3d at 278–80.

*Texas v. ICP II* described the HUD standard[4] for assessing disparate impact liability, which our circuit had adopted in the underlying case. 135 S. Ct. at 2514. It affirmed our decision, which had applied the HUD standard. *Id.* at 2526. Nonetheless, our sister circuits (now joined by our circuit in the majority opinion) disagree on the applicability of the HUD standard. *Compare Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016), *with Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 424 n.4 (4th Cir. 2018). After considering disparate impact cases under Title VII and the ADEA, the

---

[4] The U.S. Department of Housing and Urban Development ("HUD") regulations state that a plaintiff must first prove a prima facie case of discrimination under the FHA by showing that the challenged practice has a discriminatory effect. *See* 24 C.F.R. § 100.500(c)(1). If a plaintiff makes a prima facie case, a defendant must show that the challenged practice is necessary to achieve one or more of a defendant's substantial, legitimate, nondiscriminatory interests. *Id.* § 100.500(c)(2).

Court found that recognizing disparate impact claims under the FHA is consistent with the FHA's central purpose: "to eradicate discriminatory practices within a sector of our Nation's economy." *Texas v. ICP II*, 135 S. Ct. at 2521. Essentially, "not only overt discrimination[,] but also practices that are fair in form[] but discriminatory in operation," are unlawful under the FHA. *Id.* at 2517.

Finding that the FHA includes disparate impact liability, the Court went on to explain the cause of action and its limitations. The "heartland" of disparate impact liability, the Court held, includes zoning laws and housing restrictions that "function unfairly to exclude minorities from certain neighborhoods without sufficient justification." *Id.* at 2522. Disparate impact liability "has *always* been properly limited," suggesting that it was importing prior disparate impact-liability caselaw into its analysis under the FHA. *Id.* (emphasis added).

Contrary to the majority opinion's view, the Supreme Court's *Texas v. ICP II* opinion principally rejected liability "based *solely* on a showing of statistical disparity." *Id.* (emphasis added). In addition to statistical disparity, the Court required there be "artificial, arbitrary, and unnecessary barriers": in other words, a policy. *Id.* at 2522–23 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). This is what the Court describes as a "robust causality requirement," a statistical disparity that is caused by the defendant's policy.[5] *Id.* at 2523. The Court observed that a decision between two developments

---

[5] The Court wrote that:

> a disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact."

*Id.* at 2523. The Court's reference to a "robust causality requirement" referred to the existence of a causal connection between the defendants' policy and a statistical disparity. It did not add anything more.

5

likely would not be considered a policy, and therefore would not constitute a prima facie case of disparate impact.

In addition to requiring more than simply a statistical disparity, the Court noted that defendants need "leeway to state and explain the valid interest served by their policies." *Id.* at 2522. This standard highlights that the Supreme Court in *Texas v. ICP II* was reviewing a case in which a partial summary judgment had been entered for the plaintiff and a trial held on the remainder. Thus, unsurprisingly, the Court did not spend much time on pleading requirements. The famous *Twombly* and *Iqbal* cases went unmentioned by the majority opinion. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Twombly*, 550 U.S. at 570. Surely, if the Court intended to create a brand new pleading requirement in FHA cases, it would have at least said so, examining and contrasting those two important precedents.

Thus, the key to a disparate impact claim is a policy that creates the statistical disparity. Turning to the facts in our case, Defendants advertised their policy of refusing to rent to voucher holders. So, we know there is a policy. ICP did not just reference evidence that Defendants' apartment complexes are occupied by a disproportionately low percentage of African-American renters with no allegation that the Defendants have a policy causing this low-minority occupancy rate. ICP identified Defendants' "no vouchers" policy as causing this discriminatory effect and submitted statistical information specifically showing how the policy operates to exclude more African-American renters than white renters from housing at Defendants' properties. That information indicates that the voucher population in the Dallas area, the group affected by Defendants' policy, is over 80% African-American and 10% or less white. The non-voucher population in the Dallas area, the group unaffected by Defendants' policy, is alleged to be 19% African-American and 53% white.

Although ICP has not alleged all the data necessary to calculate the exact statistical disparity, it has alleged enough factual information to make its disparate impact claim plausible and to permit an inference that ICP will ultimately be able to show the exact disparity resulting from Defendants' "no vouchers" policy. *See Twombly*, 550 U.S. at 556 (stating that plausibility standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim).

How, then, did ICP lose this case at the early pleading stage? The majority opinion focused and expanded on what the Supreme Court meant by "robust causation" in its *Texas v. ICP II* decision, ignoring the Rule 12(b)(6) posture we have here.[6] The majority opinion held that *Texas v. ICP II* "undoubtedly announce[d] a more demanding test than that set forth in the HUD regulation." *Lincoln*, 920 F.3d at 902. Specifically, the majority opinion notes that the Supreme Court in *Texas v. ICP II* instituted a "robust causality requirement" at the prima facie stage, which "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact.'" *Texas v. ICP II*, 135 S. Ct. at 2523. But the Supreme Court stated only that the robust causality requirement "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Texas v. ICP II*, 135 S. Ct. at 2523. Moreover, in *Texas v. ICP II*, the Supreme Court relied on its earlier decisions in *Griggs*, 401 U.S. 424 (finding a disparate impact in passage

---

[6] Aside from the majority opinion in this case, every federal court to address whether a plaintiff adequately pleaded an FHA claim where the complaint alleged both a statistical disparity and a policy causing that disparity has held for the plaintiff. *See Reyes*, 903 F.3d at 433 (finding plaintiff had made a prima facie case for a disparate impact claim under the FHA); *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n ("Fannie Mae")*, 294 F. Supp. 3d 940 (N.D. Cal. 2018) (same); *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F.Supp.3d 20 (D.D.C. 2017) (same); *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 217 F.Supp.3d 1040 (D. Ariz. 2017) (same); *R.I. Comm'n for Human Rights v. Graul*, 120 F.Supp.3d 110 (D.R.I. 2015) (same).

of a test, which was unrelated to the job, sufficient to state a claim under Title VII), and *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) (holding that a disparate impact alone is not enough; it must stem from the specific employment policy being challenged), and lit a clear path for us to follow in determining the causation standard for successfully asserting a disparate impact claim under the FHA.

Relying on the dissenting opinion in the Fourth Circuit's decision in *Reyes*, 903 F.3d at 433–435, the majority opinion interprets "robust causation" to require ICP to do the impossible. The majority opinion "imposes the burden on ICP to show that Defendants' blanket 'no vouchers' policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area." *Lincoln*, 920 F.3d at 907. This is not the disparity that ICP alleged the Defendants' "no vouchers" policy caused, and it is not the disparity ICP is required to show under any jurisprudence.

The majority opinion incorrectly interprets "robust causation" to require a plaintiff with a disparate impact claim to establish that the challenged policy caused a "pre-existing" condition or that the challenged policy was previously unenforced. *Lincoln*, 920 F.3d at 921. But there is no precedent to support such a construction of robust causation.

In *Reyes*, the Fourth Circuit held the plaintiff's disparate impact claim should continue past the motion to dismiss stage. 903 F.3d at 423. The majority opinion in the case before us states that *Reyes* should be read narrowly, and a significant factor in that case was that it addressed "a *change* in the defendant's enforcement of its policy." *Lincoln*, 920 F.3d at 906 (emphasis added). But *Texas v. ICP II* makes no such distinction—the Supreme Court requires only a policy or practice, not a change in enforcement. The majority opinion then uses the *Reyes* dissent to support its argument. *Id.*

8

The statistics ICP alleges make it plausible that, while facially neutral, Lincoln's no voucher policy excludes more African-American renters from housing at Lincoln's properties than white renters, and thus has a discriminatory effect or perpetuates segregation in violation of the FHA.

The majority opinion posits that adopting the dissenting opinion "would effectively mandate a landlord's participation in the voucher program any time the racial makeup of [a] multi-family rental complex does not match the demographics of a nearby metropolitan area." *Id.* at 908. This concern, however, is unfounded for several reasons. First, plaintiffs must point to a specific policy that causes the discriminatory effect or perpetuates segregation *and* a statistical discrepancy—many plaintiffs will be unable to do so. Next, landlords face no liability from plaintiffs surviving a motion to dismiss. Plaintiffs still must present evidence to a jury or judge, and may not survive summary judgment. Requiring a *change* in enforcement to prove disparate impact would eliminate disparate impact liability for those entities that, at the outset, institute a policy that is artificial, arbitrary, or unnecessary, and also causes a statistical disparity. Furthermore, the other safeguards outlined by the Court, namely, that defendants have an opportunity to explain the necessity of the policy for business or public policy reasons, and the requirement that the plaintiff show that a less discriminatory alternative is available, would prevent liability for legitimate policies. *Texas v. ICP II*, 135 S. Ct. at 2518.

Footnote 9 of the majority opinion attempts to poke holes in the statistics ICP alleges by noting one defendant stated ICP's statistics were "cherry-picked." But we must accept a plaintiff's plausible allegations as true at the Rule 12(b)(6) stage; technical flaws or caveats in the statistics may be exposed at later stages of litigation. Moreover, some of the proof the majority opinion

requires may be impossible without some form of discovery.[7] As the dissenting opinion states, requiring plaintiffs to establish the level of proof the majority opinion advocates at this stage of litigation "would render disparate impact liability under the FHA a dead letter" soon after the Supreme Court established disparate impact liability exists under the FHA. *Lincoln*, 920 F.3d at 924 (Davis, J., dissenting). We should not heighten the standard for the pleading of a plaintiff's prima facie disparate impact claim under the FHA beyond what *Texas v. ICP II* requires without further direction from the Supreme Court.

The majority opinion correctly notes that the voucher program is voluntary and that property owners are permitted to refuse to accept vouchers. However, as that same opinion acknowledges: "the voluntary nature of landlord participation in the voucher program does not render it immune from liability if actionable discrimination under the FHA is established." *Id.* at 901. To sum up, at this early pleading stage, ICP has done what is necessary to state a traditional disparate impact claim.

I turn briefly to the segregative-effect claim version of a disparate impact claim. It has different elements and requires different evidence from a traditional disparate impact claim. For a segregative-effect claim, the plaintiff must establish that the defendant has a policy that perpetuates segregation. Disparate impact claims require a comparison of "how a challenged policy affects different groups, while segregative-effect claims focus on how a

---

[7] The majority opinion states, "ICP pleads no facts showing Dallas's racial composition before [Lincoln] implemented their 'no vouchers' policy or how that composition has changed, if at all, since the policy was implemented." *Lincoln*, 920 F.3d at 907. But such information is likely impossible without discovery. Discovery could reveal when a policy was put into place, when and how it was enforced, and the degree to which racial composition and demographics have changed.

challenged action affects residential segregation in the area."[8] The data to prove a segregative-effect claim may include census-tract data. It should indicate the existing locations of the predominantly majority and predominantly minority areas of the town or city and how the policy being challenged will continue the existing segregation. I conclude that this additional type of disparate impact claim has been plausibly alleged, particularly if the majority opinion's stringent robust causation approach is adopted. No one suggests that Defendants began the ugly path to segregated housing, something that has been going on for decades (centuries, even). Instead, they are perpetuating and furthering it. The majority opinion's requirement that Plaintiff show that Defendants' no-voucher policy caused African-American persons to be the dominant group of voucher holders ignores one of the main problems sought to be addressed by the FHA: the *perpetuation* of existing segregation.

Briefly stated, by continuing to exclude minorities from majority-white neighborhoods, Lincoln is perpetuating and furthering existing segregation. *See Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 42 (2d Cir. 2015) (upholding a jury verdict for a plaintiff that stated a defendant should incur liability if it "actually or predictably perpetuated, continued or maintained a segregation of African-Americans from predominantly white areas.") Eliminating such furtherance is part of the FHA's purpose. "Much progress remains to be made in our Nation's continuing struggle against racial isolation. . . . The court acknowledges the Fair Housing Act's continuing role in moving the Nation towards a more integrated society." *Texas v. ICP II*, 135 S. Ct. at 2525–26. We should do the same.

---

[8] Robert G. Schwemm, <u>Segregative-Effect Claims Under the Fair Housing Act</u>, 20 N.Y.U. J. LEGIS. & POL'Y 709, 714 (2017) (collecting cases).

The majority opinion takes the Supreme Court's "robust causality" requirement much further than it actually went, thus hampering enforcement of the FHA in three states that have numerous large cities, including three of the top ten most populous cities in the country. The impact is great. As explained in the context of racially-discriminatory jury selection, those who disagree with laws promoting equality try to find ways to flout and avoid them. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241–43 (2019). That is what Lincoln is alleged to be doing here. More than 150 years after the end of the Civil War, more than 100 years after the Supreme Court found *de jure* residential segregation by race unlawful, *Buchanan v. Warley*, 245 U.S. 60 (1917), and more than 50 years after the passage of numerous civil rights laws aimed at eliminating racial and ethnic segregation and discrimination, we are still grappling with the pernicious reach of segregation, past and present. The majority opinion in this case moves us backwards on the pathway to equality and integration. The full court should have rectified that error. Since it did not, I am hopeful that ICP will seek review from the Supreme Court.